The TOWN OF SUNNYVALE, Appellant,

v.

Charles MAYHEW, Sr., Charles Mayhew, Jr., The Estate of Audrey Mayhew, and Sunnyvale Properties, Ltd., Appellees.

No. 05–92–01401–CV.

Court of Appeals of Texas, Dallas.

May 10, 1994.

Opinion Supplementing Decision on Rehearing Feb. 16, 1995.

Alan W. Wright, Cole B. Ramey, Dallas, Robert H. Freilich, Terry D. Morgan, Kansas City, MO, Cary L. Bovey, Austin, for appellant.

Donald R. Black, Dallas, Luke C. Kellogg, San Antonio, for appellees.

Before THOMAS, OVARD and MORRIS, JJ.

## OPINION

OVARD, Justice.

This case involves a challenge to a zoning decision. The Town of Sunnyvale appeals the trial court's judgment awarding Charles Mayhew, Sr., Charles Mayhew, Jr., the Estate of Audrey Mayhew, and Sunnyvale Properties, Ltd. (the Mayhews) $5 million in damages, $2,301,369.20 in prejudgment interest, $1,204,374.13 for attorneys' fees for services rendered through trial, $100,000 in attorneys' fees in the event of an appeal to this Court, costs in the amount of $175,038.14, as well as injunctive relief allowing the Mayhews to develop their property under their original planned-development proposal. The Town attacks the trial court's judgment on several grounds by challenging the trial court's findings of fact and conclusions of

law. In twenty-three points of error, the Town contends the claims were not ripe and that the trial court erred in entering judgment for the Mayhews. Specifically, in points of error one through four, the Town asserts that the trial court lacked jurisdiction to consider the Mayhews' taking, substantive-due-process, and equal-protection claims [1] because these claims were not ripe for review. In point of error nineteen, the Town challenges the legal and factual sufficiency of the evidence to support various findings made by the trial court. Because the Mayhews failed to reapply for development or seek variances, their claims were not ripe for review. Consequently, we reverse the judgment of the trial court and dismiss the Mayhews' claims.

## FACTS AND PROCEDURAL HISTORY

From 1941 to 1986, the Mayhews acquired 1196 acres of property located in the Town.[2] They sought to develop their property in 1986. At that time, all residentially zoned property was subject to a minimum lot size requirement of one dwelling unit per acre. The Town adopted one-unit-per-acre zoning in 1973 because of septic tank problems.

In 1985, the Mayhews met with various Town officials regarding a planned development for which they sought approval. The Mayhews had never sought a change in the existing agricultural-use zoning of their property until that time. The Mayhews told the Town a planned development would not be feasible under the current one-unit-per-acre zoning. In 1986, after meeting with the Mayhews, the Town adopted a new comprehensive plan providing for a population of 25,000 by the year 2006.[3] The Town also amended article XV of the Town's zoning ordinance to permit planned developments with homes built on less than one acre.

The Mayhews paid more than $500,000 to conduct studies and prepare reports evaluat-

---

1. The Mayhews brought facial claims regarding substantive and procedural due process and a facial equal protection claim, but the trial court did not find the ordinance facially unconstitutional.

2. The total acreage in the Town was approximately 11,500 acres.

3. There was evidence at trial that the Town could not meet this population projection if the Town continued its one-unit-per-acre zoning because development would occur very slowly. There was evidence that the market for homes on one-acre lots is small.

ing various aspects of the planned development. In July 1986, the Mayhews gave the planned development application to the Town's planning and zoning committee for preliminary review. At that time, the Mayhews' application said they requested approval for the building of 3650 to 5025 units. Two months after the Mayhews submitted their application to the planning and zoning committee, the Town passed a moratorium on planned developments. The Town, however, continued to process the Mayhews' application.

The Town's planning and zoning committee recommended that the Town Council vote to deny the application. In a memorandum, the committee said the proposed density was too high, the availability of adequate sewer service was uncertain, the public facilities were inadequate, the fiscal impact was negative, and there was a potential for an adverse impact on community characteristics. The memorandum further reported that a proposal with less density would be "preferred."

After the planning and zoning committee recommended denial, the Mayhews met with Town officials. The Mayhews said they would submit the planned development application to the Town Council requesting approval for 3600 total units (slightly more than three units per acre). The Mayhews submitted the application for a planned development (PD application) to the Town Council in December 1986. The Town Council denied the Mayhews' PD application on January 13, 1987. The Mayhews did not reapply; nor did they utilize procedures for obtaining variances contained in the Town's zoning ordinance. The Mayhews did not contact officials from the Town after the Town Council denied the application. Instead, on March 6, 1987, approximately two months after the Town denied their PD application, the Mayhews instituted this suit.

Three days after the Mayhews filed suit, the Town passed another moratorium on planned developments. That moratorium lasted four months. At some time after the Mayhews filed suit, their neighbors, the Luptons, filed a PD application. The Town processed that application. The Town later denied the Luptons' application.

The trial court initially granted summary judgment in favor of the Town, from which the Mayhews appealed. This Court affirmed the summary judgment in favor of the Town regarding statutory violations alleged by the Mayhews. *See Mayhew v. Town of Sunnyvale,* 774 S.W.2d 284, 299 (Tex.App.—Dallas 1989, writ denied), *cert. denied,* 498 U.S. 1087, 111 S.Ct. 963, 112 L.Ed.2d 1049 (1991) (*Mayhew I*). This Court further found, however, that issues of material fact existed. We reversed the summary judgment on the constitutional grounds and remanded the cause to the trial court regarding these issues and the issue of ripeness. In that opinion, we stated, "If the door [to further development applications] is closed, then [the Mayhews] cannot develop [their] land. A property owner need not engage in futile reapplications." *Mayhew I,* 774 S.W.2d at 289.

This appeal is from the trial on the merits. The Mayhews' theory at trial regarding ripeness was that the Town's denial of their PD application and their neighbors' PD application and the imposition of the moratoria together established it would be useless or futile to reapply for development. As set forth above, the trial court entered judgment in favor of the Mayhews. The trial court entered the following findings of fact and conclusions of law applicable to ripeness.

### Findings of Fact

101. In denying the application for planned development approval for the Mayhew Ranch Planned Development and the application for planned development approval for the [Luptons'] Planned Development, and in enacting numerous moratoria on applications for consideration of planned development approval, the Town of Sunnyvale has acted pursuant to an official policy not to allow development with a density of greater than one dwelling unit per acre.

130. The Town of Sunnyvale considered and rejected countless alternative densities during the consideration of the application for Planned Development Approval for Mayhew Ranch Planned Development and

permutations to the density originally proposed by plaintiffs.

131. The actions of the Town of Sunnyvale reveal a pattern and practice which demonstrates the intent of the Town of Sunnyvale to deny any application for development approval with a density greater than one dwelling unit per acre.

132. Plaintiffs have exhausted all of the possible remedies and avenues of relief which were realistically available to them in the Town of Sunnyvale.[4]

133. The Town of Sunnyvale has closed the door on future reapplications by Plaintiffs at a realistic or economically viable density.

## Conclusions of Law

186. Plaintiffs have exhausted all of the possible remedies and avenues of relief which were realistically available to them in the Town of Sunnyvale.

187. The Town of Sunnyvale has closed the door on future reapplications by Plaintiffs at a realistic or economically viable density thus rendering the possibility of reapplication futile.

188. Reapplication by Plaintiffs for planned development approval with Defendant Town of Sunnyvale would have been, and is still, futile.

189. When the Town Council considered the application for planned development approval for the Mayhew Ranch Planned Development, the Town Council had the authority to and did consider and reject each and every level of density between one [1] and four and two-tenths [4²⁄₁₀] dwelling units per acre.

190. This case was ripe for adjudication.

## APPLICABLE LAW

### 1. Standard of Review—Findings and Conclusions

Findings of fact in a case tried to the court have the same force and dignity as a jury's verdict upon special issues. *City of* Clute v. City of Lake Jackson, 559 S.W.2d 391, 395 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). Findings of fact are not conclusive, however, when a complete statement of facts appears in the record. *Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex.App.—Houston [14th Dist.]), *writ ref'd n.r.e.* 699 S.W.2d 199 (Tex. 1985) (per curiam); *Stephenson v. Perlitz*, 537 S.W.2d 287, 289 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.). An appellant may attack the trial court's findings of fact on both legal and factual sufficiency grounds. *See Valencia v. Garza*, 765 S.W.2d 893, 896 (Tex.App.—San Antonio 1989, no writ).

A conclusion of law is reviewable as a question of law. *Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), *overruled on other grounds by Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 894 (Tex.1991). An appellant may not challenge a trial court's conclusions of law for factual insufficiency. However, an appellate court may review the trial court's conclusions drawn from the facts to determine their correctness. *Id.* If an appellate court determines a conclusion of law is erroneous, but the judgment rendered was proper, the erroneous conclusion of law does not require reversal. *Scholz v. Heath*, 642 S.W.2d 554, 559 (Tex.App.—Waco 1982, no writ).

### 2. Standard of Review—Legal Sufficiency Points

A legal sufficiency point is a "no evidence" point presenting a question of law. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). In reviewing a "no evidence" point of error, we consider only the evidence and inferences supporting the trial court's finding. We disregard all contrary evidence and inferences. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). We uphold the trial court's findings unless: (1) there is a complete absence of evidence to support the fact found; (2) the rules of law or evidence

---

4. Exhaustion of remedies is conceptually distinct from the finality or ripeness requirement. *See Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193, 105 S.Ct. 3108, 3120, 87 L.Ed.2d 126 (1985). To the extent that this finding and conclusion of law number 186 are conclusions of law that the Mayhews' claims are ripe, this issue is addressed below.

prohibit giving weight to the only evidence offered to prove the fact; (3) the evidence in support of the fact amounts to no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the fact. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 795 n. 3 (Tex.1991). If we sustain a "no evidence" point and the proper procedural steps have been taken, we may disregard the finding under attack and render judgment for the appellant unless, in the interest of justice, another trial is required. *Garza,* 395 S.W.2d at 823.

### 3. Standard of Review—Factual Sufficiency Points

In reviewing factual sufficiency points, we consider all of the evidence, including any evidence contrary to the judgment. *Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex.1980) (per curiam). We cannot set aside a finding unless it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). In reversing for factual insufficiency, the court of appeals must detail the evidence relevant to the issue in consideration and clearly state why the finding is factually insufficient. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g).

### 4. Land–Use Regulation Challenges— Generally

A plaintiff seeking to challenge a local government's refusal to rezone his property may bring causes of action for a taking without due process, a taking without just compensation, denial of substantive due process, and denial of the right to equal protection of the laws. *See Executive 100, Inc. v. Martin County,* 922 F.2d 1536, 1540 (11th Cir.), *cert. denied,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991). Local zoning decisions that violate a land owner's constitutional rights may give rise to claims for relief under 42 U.S.C. section 1983. *See Spence v. Zimmerman,* 873 F.2d 256, 258 (11th Cir. 1989); *Brady v. Town of Colchester,* 863 F.2d 205, 209–10 (2d Cir.1988).

### 5. Ripeness

"Ripeness" is a question of timing. *See Binker v. Pennsylvania,* 977 F.2d 738, 753 (3d Cir.1992). Federal courts view this doctrine as an offshoot of the case or controversy requirement under Article III of the federal constitution. Courts also characterize the doctrine as a prudential limitation on federal jurisdiction. *See Taylor Inv. Ltd. v. Upper Darby Township,* 983 F.2d 1285, 1289 (3d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993). Texas courts also apply the ripeness doctrine. *See City of El Paso v. Madero Dev.,* 803 S.W.2d 396, 400 (Tex.App.—El Paso 1991, writ denied), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992). The primary issue the ripeness doctrine addresses is when a proper party may bring an action. *See Armstrong World Indus., Inc. v. Adams,* 961 F.2d 405, 411 (3d Cir.1992). Ripeness is a question of law. *See Hoehne v. County of San Benito,* 870 F.2d 529, 531 (9th Cir.1989).

The ripeness doctrine avoids premature adjudication and prevents courts from entangling themselves in abstract disagreements over administrative policies. It also protects the administrative agencies from judicial interference until the agency formalizes an administrative decision and the challenging parties feel the effects of the decision in a concrete way. *See Madero,* 803 S.W.2d at 398–99. The ripeness doctrine involves the issue of jurisdiction of the subject matter and power to render a particular relief. *See id.* at 399. The ripeness issue regarding land-use regulations concerns whether courts can determine what types of uses a regulatory body will permit for the property.

It follows from the nature of a regulatory takings claim that an *essential prerequisite* to its assertion is a *final and authoritative determination of the type and intensity of development legally permitted* on the subject property. A court cannot determine whether regulation has gone 'too far' unless it knows how far the regulation goes. *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986) (emphasis added). The same standards may also apply to equal pro-

tection, substantive due process, and procedural due process claims. *See Herrington v. County of Sonoma,* 857 F.2d 567, 569 & n. 1 (9th Cir.1988) (*Herrington II* ), cert. denied, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989).

### a. Takings Claims

 The United States Supreme Court has referred to a regulation that "goes too far" as a taking. *Williamson County Regional Planning Comm'n. v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985); *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). However, that Court made it clear that takings claims are not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue. *See Williamson,* 473 U.S. at 186, 105 S.Ct. at 3116. Generally, a final decision requires at least (1) rejection of a development plan, and (2) denial of a variance. *See id.* at 188–91, 105 S.Ct. at 3117–19; *Hoehne,* 870 F.2d at 534. The ripeness doctrine requires the plaintiff to apply for a variance to establish to what extent the regulatory body will permit development.[5] Only after application and the denial of a variance can a court determine whether the regulation has gone "too far." *See Eide v. Sarasota County,* 908 F.2d 716, 725 n. 16. (11th Cir.1990), cert. denied, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991).

 The only way to avoid the final-decision requirement is if attempts to comply with the requirement would be futile. A property owner generally cannot rely on the futility exception until he or she makes at least one meaningful application for development. *See MacDonald,* 477 U.S. at 353 n. 8, 106 S.Ct. at 2568 n. 8. One application may be enough to establish that the regulatory body made a final decision if it is clear the regulatory body will deny all further applications for use or development. *See A.A. Pro-*

files, Inc. v. City of Fort Lauderdale, 850 F.2d 1483, 1487 (11th Cir.1988), cert. denied, 490 U.S. 1020, 109 S.Ct. 1743, 104 L.Ed.2d 180 (1989).

In *Williamson County,* the plaintiff brought an action pursuant to 42 U.S.C. section 1983 alleging that a county planning commission had taken its property without just compensation. *Williamson,* 473 U.S. at 182, 105 S.Ct. at 3114. The United States Supreme Court first construed the plaintiff's complaint "as stating a claim under the Just Compensation Clause" and then dismissed the complaint because it was not ripe for adjudication, holding as follows:

> because [the plaintiff] has not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulation to its property, nor utilized the procedures Tennessee provides for obtaining just compensation, [the plaintiff's] claim is not ripe.

*Id.* at 186, 105 S.Ct. at 3116. The Court found the plaintiff had not obtained a "final decision" because the plaintiff:

> *did not seek variances that would have allowed it to develop the property according to its proposed plat,* notwithstanding the Commission's finding that the plat did not comply with the zoning ordinance and subdivision regulations. It appears that variances could have been granted to resolve at least five of the Commission's eight objections to the plat. The Board of Zoning Appeals had the power to grant certain variances from the zoning ordinance ... [and] had the power to grant variances from the subdivision regulations.... Indeed, the Temple Hills Committee had recommended that the Commission grant variances from those regulations. Nevertheless, [the plaintiff] did not seek variances from either the Board or the Commission.

*Id.* at 187–88, 105 S.Ct. at 3117 (emphasis added). The Court concluded as follows:

---

5. The term "variance" is not definitive or talismanic. If other types of permits or actions are available and could provide similar relief, a landowner must seek them. *See Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498,

503 (9th Cir.1990); *Hoehne,* 870 F.2d at 533–35 (discussing availability of relief via conditional-use permits, zoning changes, general plan amendments).

[The plaintiff] has not yet obtained a final decision regarding how it will be allowed to develop its property. Our reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty," this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. *Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.*

*Id.* at 190–91, 105 S.Ct. at 3118–19 (emphasis added) (citations omitted).

The Court then addressed the plaintiff's claim under the due process theory that a "regulation that goes so far that it has the same effect as a taking by eminent domain is an invalid exercise of the police power, violative of the Due Process Clause of the Fourteenth Amendment." *Id.* at 197, 105 S.Ct. at 3122. The Court similarly dismissed the complaint as premature, holding it was not ripe for the same reasons. *Id.* at 199–200, 105 S.Ct. at 3123.

### b. Equal Protection and Substantive Due Process Claims

Whether the same ripeness standard that applies to takings claims also applies to equal protection and substantive due process claims depends on the way the plaintiff asserts those claims at trial. *See Eide,* 908 F.2d at 725 n. 16; *Herrington II,* 857 F.2d at 569. Where a cause of action for substantive due process violations, in effect, relates to the same issues and involves the same facts as the takings claim, courts have applied the two-pronged final decision rule used in takings cases. *See Herrington II,* 857 F.2d at 569. In *Eide,* the Eleventh Circuit said courts should apply the same "takings" ripeness standard to equal protection, substantive due process, and takings claims where the plaintiff contends the regulatory body deprived the landowner of all use of his or her property. *Eide,* 908 F.2d at 725 n. 16. Courts have also held the same ripeness requirement applies in all cases involving as-applied challenges to regulatory takings, whether based on the just compensation clause, the due process clause, or the equal protection clause. *See Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 507 (9th Cir.1990), *cert. denied,* 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991); *Shelter Creek Dev. Corp. v. City of Oxnard,* 838 F.2d 375, 379 (9th Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 106 (1988).

### c. The Futility Exception

Futility is an exception to the ripeness doctrine. Courts may review land-use regulations after only one denial, and a landowner need not reapply where reapplication would be useless or futile. *See Mac-Donald,* 477 U.S. at 352 n. 8, 106 S.Ct. at 2568 n. 8; *Agins,* 447 U.S. at 259–60, 100 S.Ct. at 2140–41. Courts have not clearly articulated the precise test regarding when the futility exception applies. Courts hold it is futile to request a variance if the land-use regulation does not permit variances. *See Herrington II,* 857 F.2d at 569–70. A landowner may also establish futility by showing that, after the regulatory body denied one application, it more restrictively zoned the property. *See Hoehne,* 870 F.2d at 535. Moreover, a landowner may establish futility by showing that the regulatory body rejected a sufficient number of prior applications. *See American Sav. & Loan Ass'n v. Marin County,* 653 F.2d 364, 371 (9th Cir.1981) (citing *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 116 & n. 17, 98 S.Ct. 2646, 2655 & n. 17, 57 L.Ed.2d 631 (1978)). The landowner must make at least one "meaningful application." This requirement does not mean that if the regulatory body rejects one "exceedingly grandiose" development plan application, this indicates the body will reject all other land-use applications. *See Mac-Donald,* 477 U.S. at 354 n. 9, 106 S.Ct. at 2569 n. 9. The futility exception applies where the manner in which the regulatory

body rejects the first application makes it clear it will not approve any project. *See Southern Pac.*, 922 F.2d at 504 & n. 7.

## APPLICATION OF THE LAW TO THE FACTS

### 1. Ripeness

#### a. Due Process and Just Compensation Takings Claims

In its first and fourth [6] points of error, the Town contends the trial court incorrectly concluded that the Mayhews' takings claims were ripe for review. The record reflects that the Town's zoning ordinance then in effect provided for procedures to obtain planned development approval for development at greater than one unit per acre. The ordinance also provided for procedures to obtain special-use permits and variances from existing zoning. The record reflects that the Mayhews did not file another PD application or an application for variances. The Mayhews do not dispute the fact that they filed only one formal PD application before filing suit.

▆▆▆ The Mayhews brought a due process takings claim and a just compensation claim pursuant to 42 U.S.C. section 1983 in their First Amended Original Petition. They alleged the application of the Town's zoning ordinance and the denial of their PD application deprived them of all economically viable use of their land in violation of their right to due process. They alleged damages in excess of $15,000,000 and asked for an injunction prohibiting the Town from enforcing the ordinance against them. The Mayhews had the burden to show their claims were ripe. *See Madero*, 803 S.W.2d at 400–01; *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 876 (9th Cir.1987), *cert. denied*, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988).

▆▆▆ The trial court concluded there was a taking and that the Mayhews' claims were ripe. We conclude, however, that the claims

were not ripe. The claims could not be ripe for determination until the government entity charged with implementing the regulations reached a final decision regarding the application of its regulations to the property at issue. *Williamson County*, 473 U.S. at 186, 105 S.Ct. at 3116. Because the Mayhews did not reapply for development or seek to develop their property by obtaining variances, they did not establish that the Town made a final decision regarding what development the Town would permit on their property. *See MacDonald*, 477 U.S. at 353 n. 8, 106 S.Ct. at 2568 n. 8. This Court does not know how far the Town's regulations go, and we conclude the claims are premature. *See Williamson County*, 473 U.S. at 186–87, 105 S.Ct. at 3116–17.

#### b. Substantive Due Process and Equal Protection Claims

▆▆▆ In its second, third, and fourth points of error, the Town contends the trial court incorrectly concluded that the Mayhews' substantive due process and equal protection claims were ripe for review. In their petition, the Mayhews pleaded that the Town's ordinance, as applied to them, denied them substantive due process and equal protection.[7] Under both of these claims, the Mayhews complained of the use of their property, stating that, "As a result of the decision of the Town Council of the Town of Sunnyvale and the resulting continued application of an unconstitutional zoning ordinance of the Town of Sunnyvale to the plaintiffs and the use of plaintiff's property, plaintiffs have suffered injury...."

The *MacDonald* reapplication requirement applies to the Mayhews' substantive due process and equal protection claims because, as the Mayhews allege these claims, they complain that the Town's use of their property injured them. The Mayhews also argued at trial that the Town's actions deprived them of all beneficial use of their property. *See Eide*, 908 F.2d at 725 n. 16. They contended they could not derive a profit even from

---

**6.** In point of error four, the Town contends all of the Mayhews' claims were not ripe.

**7.** Under their equal protection claims, the Mayhews complained that the ordinance, as applied to them, prohibited the construction of a planned unit development.

agricultural use. Regarding these claims, they argued that the Town used their property as a "park" and converted it to permanent open space for the public. They further argued at trial that the evidence regarding their equal protection and substantive due process claims was the same as that supporting their takings claim.

We see no reason to treat the Mayhews' substantive due process and equal protection claims differently from their takings claim because (1) under each cause of action they complain of the use of their property; (2) the damages alleged for their substantive due process and equal protection claims are the same as for their takings claim; (3) the Mayhews alleged an amount of damages under all three claims ($15,000,000) that would, based on their evidence, compensate them for a complete taking; (4) the Mayhews based their complaints at trial on the contention that the Town did not permit them an economically viable use for their property; and (5) under their equal protection and substantive due process claims, the Mayhews sought money damages for the total loss of the property rather than just an injunction and perhaps some money damages, the usual remedy for such claims. All of the Mayhews' as-applied claims turn on issues regarding the deprivation of their property due to land-use regulations applied to the property. *See id.; see also Herrington II,* 857 F.2d at 569 n. 1. Therefore, these as-applied claims are not ripe until the Mayhews make further application to the Town regarding permitted uses for their property. *See Eide,* 908 F.2d at 725 n. 16; *see also Southern Pac.,* 922 F.2d at 507.

## 2. Futility

The Mayhews contended at trial that it was futile to reapply for development approval. The trial court's conclusions of law regarding futility are as follows:

187. The Town of Sunnyvale has closed the door on future reapplications by Plaintiffs at a realistic or economically viable density thus rendering the possibility of reapplication futile.

188. Reapplication by Plaintiffs for planned development approval with Defen-

dant Town of Sunnyvale would have been, and is still, futile.

In its argument under points of error one through four, the Town contends the trial court's conclusions of law regarding futility are incorrect. The Town contends the Mayhews did not meet their burden to prove reapplication would be useless or futile. *See MacDonald,* 477 U.S. at 353 n. 8, 106 S.Ct. at 2568 n. 8; *Agins,* 447 U.S. at 259–60, 100 S.Ct. at 2140–41; *see also Samaad v. City of Dallas,* 940 F.2d 925, 934 (5th Cir.1991) (burden of proof).

The record reflects that after the planning and zoning committee recommended that the Town deny the Mayhews' PD application, Charles Mayhew, Jr. (Chuck) met with some Town officials and two Town Council members. Chuck testified that at the meeting, the Mayhews offered compromises and agreed to decrease the proposed density in the PD application from the requested range of 3650 to 5025 units to a total of 3600 units. The Mayhews also offered to pay for additional development costs and expenses.

James Northrup, a land developer who worked with the Mayhews to put together their PD application, testified that the Mayhews did not reapply to the Town because (1) the Town put a moratorium on planned developments; (2) the Town decided against reconsidering their PD application; (3) the Town also rejected the Luptons' PD application; (4) the citizens of the Town elected some "strident [one-unit-per-acre development] supporters" after the Town rejected the Mayhews' PD application; and (5) the Mayhews had already gone through "eighteen months of negotiations" with the Town. He further testified the Mayhews believed reapplying was futile because "they knew they had an agreement [with the council members they met with] and then they saw [the PD application] denied."

Chuck testified that the Mayhews' plan was to sell their property to the Trammel Crow Company (Crow) for development. He said the planned development would have been feasible with a density of less than 3600 units if the Town paid some development

costs.[8] The Mayhews said in their pleadings that they told Town officials that 3500 was the minimum number of units that would make the development economically feasible. They further pleaded that Town officials asked them for an analysis regarding the costs the Town would have to pay to reduce the number of units to 3000.[9] The Mayhews did not resubmit a plan with reduced density after the denial.

Chuck testified that, after the denial, he did not speak to any Town officials about reconfiguring the application with different densities or different amenities. He said he told the Town officials that the lowest density the Mayhews would agree to was 3600 units, unless the Town paid some development costs.

Chuck testified that he did not have an opinion regarding whether development at 3500 units would be economically viable, and then said he did not think it would be. He agreed that he said during his deposition that a development at 3500 units would be economically viable if the Town paid some development costs. He said the number "3500" was a typographical error in his deposition, and he meant "3600." He said no market exists for the sale of the Mayhews' land.

Chuck said other developers besides Crow negotiated with the Mayhews regarding development. Chuck testified that no one called trying to purchase the property since the Town denied their PD application. He said the Mayhews did not advertise the property and did not hire anyone to try to sell it after the denial. He called two or three companies in an attempt to sell the land and was not successful. He said he did not make contingency plans in case the Town denied the PD application. He said that, after the denial of the application, the Mayhews talked to one company about using the property as a dump or a racetrack, although neither use ever occurred.

Chuck testified that, before the denial, another development company sought to enter into a joint venture with the Mayhews to develop the property. He said the Mayhews did not want to risk being part of such a joint venture. Instead, the Mayhews sought to sell the property "outright." Chuck said the developer, Bellamah, a subsidiary of New Mexico Power and Light, offered to enter into the development joint venture with the Mayhews. Bellamah was to contribute cash in an amount equal to the value of the land contributed by the Mayhews. The two groups were to share the profits. The Mayhews viewed the joint venture as being more "risky" than the sale of the property to Crow.

John Taylor Boyd, a real estate broker, testified for the Mayhews. He said Crow negotiated with the Mayhews to purchase the Mayhews' property for $23 million for development purposes. Boyd worked with Crow and the Mayhews regarding the proposed sale. He testified that Crow would not develop the property at less than 3600 units because Crow would not "do" a community without adding "fancy stuff." Crow would not go below 3600 units because Crow would not be able to make a profit and still put in "beautiful corridors" and other "fancy" amenities.

Michael Smiley, a land planner testifying for the Mayhews, testified that the Mayhews intended to develop their land to be like Highland Park, with high levels of quality and abundant landscaping. He said Highland Park is an upper-income area.

■■■ Much of the evidence at trial concerned the viability of the Mayhews' PD application. There was little or no evidence regarding other possible uses for the property. The Mayhews did not submit applications for variances for other uses. The evi-

---

**8.** At trial, witnesses for the Mayhews testified regarding whether the planned development would be economically viable or feasible at less than the density requested in their only application: 3600 units. Several witnesses testified that it would be a "close case" whether development at less than 3600 units would be economically viable. Most witnesses indicated that develop-

ment at slightly less than 3600 units could be economically viable.

**9.** There was no evidence in the record that the Mayhews submitted an application with decreased density or that they asked the Town to pay some development costs to achieve the reduced density requested by the Town.

dence regarding the Town's denial of the Mayhews' PD application does not establish futility. *See MacDonald,* 477 U.S. at 347, 106 S.Ct. at 2565. We cannot consider the Mayhews' claims until they obtain a final decision regarding what land use the Town may permit.

██ The Mayhews assert that they should not be required to reapply for any land use that involves a density of less than 3600 units, the density they requested. However, as stated by the United States Supreme Court, in *MacDonald:*

> *The denial of* [a particular plan for relatively intense residential development] *cannot be equated with a refusal to permit any development.... Land use planning is not an all or nothing proposition. A governmental entity is not required to permit a landowner to develop property to* [the] *full extent he might desire or be charged with an unconstitutional taking of property.* Here, ... the refusal of the defendants to permit the intensive development desired by the landowner does not preclude less intensive, but still valuable development.

*Id.* (emphasis added) (quoting lower court opinion).

Similarly, in *Baytree of Inverrary Realty Partners v. City of Lauderhill,* a developer alleged a takings claim because the city refused to grant its application to amend the existing zoning. It sought to build a 327–unit residential apartment complex on its property. The Eleventh Circuit Court of Appeals said:

> Baytree has only been told that it cannot build a 327–unit residential apartment complex on its property. It has not been told that no development of its property is allowed. That Baytree may not be able to develop exactly what it originally wanted

does not mean that its investment-backed expectations are eradicated.

. . . . .

> "Neither deprivation of the most beneficial use of land, nor a severe decrease in the value of property, measures up to an unlawful taking."

*Baytree of Inverrary Realty Partners v. City of Lauderhill,* 873 F.2d 1407, 1410 (11th Cir. 1989) (citation omitted). Therefore, denial of the Mayhews' application did not establish futility.

The Mayhews next contend reapplication is futile because individual members of the Town Council have so indicated. Chuck testified that the Town has never granted a variance from one-unit-per-acre development since the Town implemented that zoning.[10] The Mayhews contended at trial that the new council members would not have voted to approve any amended application.

██ Several witnesses also testified that investors assume the Town will deny all development applications. They said the Town's denial of the Mayhews' PD application indicates the Town will not approve any development. However, the Town Council acts as a governing body, and this Court will not consider the statements of individual members regarding how they have voted or may vote when deciding whether the Town will approve any formal applications for development or variances.[11] *See Madero,* 803 S.W.2d at 401; *Mayhew I,* 774 S.W.2d at 298–99; *see generally Sosa v. City of Corpus Christi,* 739 S.W.2d 397, 404–05 (Tex.App.— Corpus Christi 1987, no writ) (holding that individual city council members may not testify regarding their individual mental processes, indicating "good faith" of council, which acts as whole, cannot be shown by such testimony). The Mayhews' informal endeavors to obtain approval of their development plans do not constitute a formal application, which is required for finality. *See*

---

**10.** Robert Ewalt, the Town manager, testified that the majority of development in the Town is on less than one acre. However, the Town approved the plat for some subdivisions before it adopted one-unit-per-acre zoning. This allowed development at three to four units per acre in those subdivisions.

**11.** The Town Council members did not testify. The mayor testified that he was personally opposed to the development.

*Madero,* 803 S.W.2d at 401. The result of local elections also does not establish that the Town Council would reject further applications for development or for variances. We further hold that testimony about the Town's "mood" and speculation about what development the Town would permit is no evidence of futility. *See id.* The Mayhews were required to bring formal applications before the Town Council.

### a. The Effect of the Moratoria and the Luptons' Application

#### (1) The Moratoria

The Mayhews assert that it was futile to reapply because the Town placed moratoria on planned developments. Other courts have held that where a regulatory body completely bars a landowner from building on his property, reapplication for permits or variances is futile. *See A.A. Profiles,* 850 F.2d at 1487 (city not only temporarily and later permanently suspended approval of development project, but also rezoned property, effectively placing "complete moratorium" on development); *Corn v. City of Lauderdale Lakes,* 816 F.2d 1514, 1516 (11th Cir.1987) (city completely banned development on the property and conceded that even variances were not available to landowner).

The court in *Calibre Spring Hill, Ltd.,* discussed moratoria and futility. In that case, Calibre sought to rezone its property to build an apartment complex. The county denied its rezoning application. Calibre filed suit alleging the county had taken its property without due process and without just compensation. The Georgia federal district court said:

> In [*Corn* and *A.A. Profiles* ], the Eleventh Circuit held that since *no* development was allowed, [the] plaintiffs' claims were ripe for adjudication. It has not been decided how much development will ultimately be permitted on [Calibre's] land. [Calibre] does not assert that [the county] has aimed its zoning decision at halting plaintiff's development, nor is there a *moratorium on development* of [Calibre's] land.
>
> The Boards' denial of [Calibre's] single request for rezoning does not establish

whether [the county] has denied [Calibre] *all* reasonable beneficial use of its property, and, therefore, is not a final reviewable decision under *Williamson.* Therefore, [Calibre's claims] are not ripe....

*Calibre Spring Hill, Ltd. v. Cobb County, Ga.,* 715 F.Supp. 1577, 1580 (N.D.Ga.1989) (emphasis added).

In this case, the trial court entered the following findings of fact regarding the effect of the moratoria and the Luptons' PD application on futility:

101. In denying the application for planned development approval for the Mayhew Ranch Planned Development and the application for planned development approval for the [Luptons'] Planned Development, and in enacting numerous moratoria on applications for consideration of planned development approval, the Town of Sunnyvale has acted pursuant to an official policy not to allow development with a density of greater than one dwelling unit per acre.

131. The actions of the Town of Sunnyvale reveal a pattern and practice which demonstrates the intent of the Town of Sunnyvale to deny any application for development approval with a density greater than one dwelling unit per acre.

133. The Town of Sunnyvale has closed the door on future reapplications by Plaintiffs at a realistic or economically viable density.

◼◼ In point of error nineteen, the Town challenged the legal and factual sufficiency of the evidence to support these findings. We first address point of error nineteen as it concerns the legal sufficiency of the evidence to support these findings. *See Best,* 786 S.W.2d at 671. Regarding the evidence in support of the findings, the record reflects that the Town passed a moratorium on planned developments after the Mayhews filed their PD application. Also, two years after the Mayhews filed suit, the Town denied the Luptons' PD application. This evidence, standing alone, constitutes evidence that the Town would not allow development at more than one unit per acre and indicated that reapplication would be futile. We overrule the Town's point of error to the extent it

complains of the legal sufficiency of the evidence to support these findings.

■ We now review these findings for factual sufficiency and review all the evidence that concerns these findings. *See Burnett,* 610 S.W.2d at 736. The record reflects that the Town passed a moratorium in September 1986, approximately two months after the Mayhews first submitted their application to the Town's planning and zoning committee. This moratorium apparently was in effect until the Spring or Summer of 1987.

After the denial, the Mayhews filed suit against the Town on March 6, 1987. The Town passed a second moratorium on March 9, 1987, three days after the Mayhews filed suit. That moratorium resolution said it was to last approximately four months, until July 1, 1987. No moratorium was in effect between July 1987 and May 1988, when the Town passed another moratorium on planned developments. The May 1988 moratorium lasted approximately six months. In May 1989, the Town passed another moratorium that said the moratorium "shall not exceed a period beyond November 8, 1989." It is not clear how long that moratorium was in effect. The record reflects that each of the moratoria said the Town was undergoing rapid growth and that the Town should manage this growth in an orderly manner. The moratoria resolutions said "necessary studies and committee reports must be made in order to manage and properly plan for such growth."

Chuck Mayhew testified that after the Town denied the Mayhews' PD application, the Town ordered a moratorium on PD applications. He said the moratorium was "in effect when the lawsuit was filed." He said that, after the denial, the Town passed a moratorium prohibiting PD applications. The Mayhews do not dispute the fact that the Town continued to process the Mayhews' PD application despite the fact that it passed a moratorium on planned developments.

Northrup testified that the Town sought to encourage planned developments. Northrup said the Town was "ready for a quality project" and the people of the Town were receptive to a PD application. He testified the people he talked to at meetings regarding the Mayhews' PD application seemed ready for a quality planned development. He said the Town's mayor pro tem expressed a willingness to modify existing zoning to allow development at a density of greater than one unit per acre.

The Mayhews state in their brief, and the record reflects, that the Town amended its zoning ordinance in 1986. The amendment allowed the Town to grant approval of PD applications with density greater than one unit per acre. Northrup testified that after the Town denied the Mayhews' application, the Town contemplated reconsidering the application.

In considering all of this evidence, we note that, before the Town denied the Mayhews' PD application, the planning and zoning committee said a less intense development than the 3650 to 5025 total units initially proposed would be "preferred." It expressed concern with density, municipal facilities, and environmental problems regarding the Duck Creek plant. In the resolution passing the March 1987 moratorium, the mayor pro tem said the Town needed to conduct studies regarding growth and development. Neither the Town's March moratorium resolution nor the planning and zoning committee's memorandum states that the Town would not allow *any* development. The Town merely denied the Mayhews' single PD application for a minimum of 3600 units. Further, the moratoria did not prohibit applications for variances.

This evidence does not support the trial court's inference that the Town's official policy was to deny development at more than one unit per acre. There were still procedures available to the Mayhews for developing their property when they filed suit, including procedures to obtain variances. *Compare Hoehne,* 870 F.2d at 535 (futile for landowner to seek general plan amendment approval where no variance procedure available and where regulatory body established unwillingness to allow development by rezoning property to further restrict development) *and Herrington II,* 857 F.2d at 569–70 (futile for landowner to reapply for development approval where only procedure available was general plan amendment and testimony es-

tablished that this procedure was not a practical alternative) *with Williamson,* 473 U.S. at 188–90, 105 S.Ct. at 3117–18 (developer who was denied plat approval for subdivision required to use available variance procedures to obtain final decision regarding what use of property will be permitted).

The fact that a moratorium on planned developments was in place did not establish that the Town foreclosed all development. The Town continued to process PD applications. It amended its zoning ordinance in 1986 to allow for planned developments at a density greater than one unit per acre. *See Williamson,* 473 U.S. at 188, 105 S.Ct. at 3117 (court found claims not ripe because landowner did not seek variance and also noted that committee had recommended granting of variances). This is evidence that the Town did not prohibit all development.

Further, there is evidence that the Mayhews did not consider filing another PD application. It is undisputed that the Mayhews were only interested in a density of 3600 units or more. John Boyd, the Mayhews' real estate broker, testified that Crow, who negotiated with the Mayhews to purchase the property, would not purchase the property unless the Town approved an application with a density of at least 3600 total units. Chuck testified that he told the Town the Mayhews would not accept an approval of anything less than 3600 units. Chuck said he did not speak to any Town officials regarding reapplication after the Town Council voted to deny the Mayhews' PD application. He said he told the Town Council on January 13, 1987 that if the Town did not approve the PD application for 3600 units or more, it would be considered an "outright denial." After the denial by the Town Council, the Mayhews did not amend their PD application and apply for a less dense development or a variance.

This evidence shows the Mayhews did not intend to reapply or seek variances if the Town denied their PD application. Whether a moratorium was in effect makes no difference because the Mayhews did not consider reapplication. The Mayhews' stated position was similar to that of Hamilton Bank in *Williamson.* In that case, the bank said it

was futile to seek variances after the zoning commission refused to approve its plat. The bank told the zoning commission it would not seek variances until the commission approved its plat. It filed suit instead of seeking variances from existing zoning. The United States Supreme Court held the bank was required to seek variances to have a final decision regarding whether its land had been taken. *See Williamson,* 473 U.S. at 187–88, 105 S.Ct. at 3116–17.

Likewise, *Corn* and *A.A. Profiles,* discussed above, do not stand for the proposition that the passing of any moratorium automatically renders all takings claims ripe. *Corn* and *A.A. Profiles* stand for the proposition that, where the regulatory body *prohibits all development,* then further reapplication is futile. *See A.A. Profiles,* 850 F.2d at 1487; *Corn,* 816 F.2d at 1516. The Town did not forbid all development on the Mayhews' property or on the property of other landowners. It continued to process PD applications.

We cannot conclude from the evidence in the record that any moratorium caused reapplication to be futile because (1) the Town considered both the Luptons' and Mayhews' PD applications while a moratorium on planned developments was in effect; (2) the memorandum from the planning and zoning committee did not say it foreclosed all development on the Mayhews' property; (3) the Mayhews could have applied for variances under other sections of the ordinance; (4) the Town's March 1987 moratorium stated that it was for a short period so the Town could plan for development projects; (5) the Town considered other PD applications after the March moratorium; and (6) the Mayhews said they would not reapply for lesser density. The trial court's inferences about the Town's intent to deny development, based on this evidence, are not supported by factually sufficient evidence.

### (2) The Luptons' Application

The Mayhews assert that the Town's denial of the Luptons' PD application shows it was futile to reapply to the Town regarding the use of their land. The record reflects that the Town began reviewing the Luptons'

zoning case in December 1987, after the Mayhews had already filed suit. The Town denied the Luptons' PD application more than two years after the Mayhews filed suit.

Futility concerns the reasons why it is useless for an applicant to seek reapplication and allows the property owner to file suit rather than file useless applications for development approval. Because the Mayhews had already filed suit when the Town denied the Luptons' PD application, it cannot be said that the Mayhews decided reapplication was futile based on the denial of their neighbors' PD application.

Regarding any later-developing ripeness indicated by the denial of the Luptons' application, the record reflects the following: Dan Sefko, an urban planner testifying for the Town, said the Town asked his firm to review the Luptons' "zoning case" in December 1987.[12] The Luptons filed their PD application, and the Town considered it after the Town passed the March 1987 moratorium. Sefko said the Luptons' planned development involved more than 1000 acres. It was similar to the Mayhews' proposed development in location, size, and density and was also primarily for residential development. He testified that the Mayhews' and Luptons' applications were similar. The Mayhews' application had a significantly higher quantity of open space. The Luptons' development plan was consistent with the Town's comprehensive plan. He said the density proposed by the Luptons (less than two units per acre) was appropriate for the Town. He did not know whether the Luptons' PD application indicated sewer service would be available. Sefko agreed that a regulatory body may approve a PD application with conditions, such as conditions regarding sewer service. He said he did not study traffic issues regarding the Luptons' application.

Sefko testified that his firm did not serve as the clearinghouse for the Town's analysis of the Luptons' application. His firm did not prepare the report submitted to the Town regarding the Luptons' application, but prepared a portion of it. He said the Luptons' PD application satisfied the section of the ordinance that set forth the types of information required to be in PD applications: article XV. Sefko said he did not consider fiscal impacts in determining appropriate density. He said he generally recommended that the Town approve the Luptons' application.

Robert Ewalt, the Town manager, said the Town voted unanimously to deny the Luptons' application. In the statement of facts, there is argument from the Town's attorneys regarding why the Town denied the Luptons' application. However, this is not evidence. See McCain v. NME Hosp., Inc., 856 S.W.2d 751, 757 (Tex.App.—Dallas 1993, no writ); Delgado v. Kitzman, 793 S.W.2d 332, 333 (Tex.App.—Houston [1st Dist.] 1990, no writ). There is nothing in the record from the Town's planning and zoning committee or Town Council, such as a denial or recommendation memorandum, showing any stated reasons for the denial that this Court can compare with evidence regarding the Luptons' plan. The Luptons' application and related reports are not in the record.

The Town may have denied the application based on specific safety or health concerns that would not pertain to other proposals. See Southern Pac., 922 F.2d at 504 & n. 7 (in deciding futility, court considered evidence that regulatory body denied another applicant variance, but rejected this as evidence of futility because denial was "based on specific safety and aesthetic concerns which would not pertain to other proposals.") The Mayhews had the burden to prove futility. See Samaad, 940 F.2d at 934. The fact that the Town denied the Luptons' application for an unspecified reason does not establish that the Town acted to deny all development at more than one unit per acre.

We are aware that, in reviewing factual sufficiency points, we are not to substitute our judgment for that of the trial court regarding the credibility of the witnesses. See Aerospatiale Helicopter Corp. v. Universal Health Serv., 778 S.W.2d 492, 498 (Tex. App.—Dallas 1989, writ denied), cert. denied, 498 U.S. 854, 111 S.Ct. 149, 112 L.Ed.2d 115 (1990). Questions of intent and mental states are normally questions of fact left to the trier

12. The date the Luptons filed their PD application is not reflected in the record.

of fact who had the opportunity to judge the credibility of the witnesses. *See Logan v. Mullis,* 686 S.W.2d 605, 608 (Tex.1985). However, in drawing inferences about the Town's intent to deny all development from the facts in the record, the trial court did not judge the credibility of the witnesses from the Town. The trial court did not weigh the "credibility" of the Town as a witness because the Town could not testify. The council members did not testify.[13] The trial court was called upon, not to weigh the "credibility" of the Town as a witness, but to make inferences regarding futility based on the facts before it.

■ We must weigh the reasonableness of the inferences that could be drawn by the trial court in light of all facts and circumstances. *See Texas & N.O.R. v. Burden,* 146 Tex. 109, 123, 203 S.W.2d 522, 531 (1947). Considering all the evidence in the record, and based on the objective evidence before the trial court regarding futility, we hold that an inference or conclusion that the Town intended to deny all development is incorrect. The manner in which the Town rejected the Mayhews' application did not make it clear that the Town would refuse all projects. *See Southern Pac.,* 922 F.2d at 504. Based on the facts of this case, we hold that this evidence does not support the finding that the Town prohibited all development at more than one unit per acre. Because variance procedures were available, we hold the Mayhews were required to utilize them. *See Williamson,* 473 U.S. at 186, 105 S.Ct. at 3116. We sustain the Town's point of error to the extent it complains of the factual sufficiency of the evidence to support findings of fact numbers 101, 131, and 133.

#### b. Range of Densities

The Mayhews next contend that reapplication was futile and the Town would not permit development of the Mayhews' property because the Town had already considered and rejected a "range" of development possibilities. Apparently, this assertion refers to the Town's consideration of a range of densi-

ties. In its findings and conclusions, the trial court found as follows:

#### Findings of Fact

130. The Town of Sunnyvale considered and rejected countless alternative densities during the consideration of the application for Planned Development Approval for Mayhew Ranch Planned Development and permutations to the density originally proposed by plaintiffs.

#### Conclusions of Law

189. When the Town Council considered the application for planned development approval for the Mayhew Ranch Planned Development, the Town Council had the authority to and did consider and reject each and every level of density between one [1] and four and two-tenths [4²⁄₁₀] dwelling units per acre.

In point of error nineteen, the Town challenged the legal and factual sufficiency of the evidence to support this finding. It also challenged the correctness of the conclusion of law number 189. We first review the Town's legal sufficiency point. In reviewing the evidence in support of this finding, we note that Chuck testified that the Town considered a range of densities. This is evidence in support of the finding that the Town considered a range of densities. We overrule this point of error to the extent it applies to the legal sufficiency of the evidence to support this finding. We now review for factual sufficiency this finding that the Town considered and rejected levels of density less than the 3600 units formally requested in the Mayhews' PD application.

Northrup testified that the Mayhews filed only one PD application. Chuck testified several times that the Mayhews submitted only one PD application and that the minimum number of units proposed was 3600. He said he did not "reconfigure" the application after the denial. He said the Mayhews told the Town they would not accept anything below 3600 units. In their PD applica-

---

**13.** Because the Town Council acts as a governing body, evidence concerning statements of individual members regarding how they may vote when deciding whether the Town will approve any applications for development or variances is not relevant. *See Madero,* 803 S.W.2d at 401.

tion, the Mayhews did not request approval for less dense development. A review of all the evidence shows the Town considered only one PD application for the Mayhews, and that the proposed density was for a minimum of 3600 units. *See Burnett,* 610 S.W.2d at 736. We hold the evidence is factually insufficient to support the trial court's finding that the Town considered a range of densities.

The Mayhews contend that article XV, section five of the Town's zoning ordinance authorizes the imposition of conditions on planned development approvals, including limits on the number of permitted units. They assert that article XV required the Town to approve their PD application and then propose conditions or changes to the plan. The trial court entered a finding of "fact" and also a conclusion of law that the Town Council had the authority to approve the Mayhews' application with conditions, including a condition of lower density. This "finding of fact" is actually a conclusion of law because it addresses the Town's power or authority. Accordingly, we address this as a conclusion of law rather than as a finding of fact. On appeal, the Town challenged both this finding and conclusion of law number 189.

 Section 5 of article XV of the ordinance is as follows:

Deviation from the regulations established in this ordinance applicable to particular uses may be permitted when the developer demonstrates that adequate provisions have been made in the planned development to protect contiguous land uses, that pedestrian and vehicular traffic ... systems are safe, ... that the development will progress in orderly phases, and that the public ... welfare will be protected. For the PD district, use regulations applicable to a particular use shall be the same as if such use were situated in a district in which such uses are otherwise permitted in this ordinance, unless other restrictions and regulations are approved as a part of the development site plan and the PD district ordinance amendment.

Contrary to the Mayhews' contention, this section does not require the Town to approve a PD application at densities of less than those proposed. Chapter 16 of MIXON, TEXAS MUNICIPAL ZONING LAW, cited by the Mayhews, also does not cite Texas law requiring the Town to approve PD applications with conditions rather than deny the applications. MIXON, TEXAS MUNICIPAL ZONING LAW, ch. 16 (2d ed. 1993). We will not presume the Town acted upon any applications or variations of applications other than those actually presented to it for approval. In *MacDonald* and *Williamson,* the Court required landowners to reapply upon denial and did not assume the regulatory body could have or should have accepted the application with modifications. *See, e.g., MacDonald,* 477 U.S. at 348, 106 S.Ct. at 2565; *Williamson,* 473 U.S. at 186, 105 S.Ct. at 3116. The evidence at trial showed the Mayhews did not ask for approval of a modified application.

### c. Availability of Variance Procedures

 The Mayhews contend that they did not have to apply for variances because, "according to the Town's own attorney," no procedure for obtaining variances existed. It is futile to apply for a variance if it is not a legally viable option. *See Hoehne,* 870 F.2d at 535. The Mayhews attached to their brief in this appeal a page from a brief purportedly filed by the Town in the United States Supreme Court in an earlier appeal related to this case. We will not consider this evidence because it is outside the record.[14] *See Carlisle v. Philip Morris, Inc.,* 805 S.W.2d 498, 501 (Tex.App.—Austin 1991, writ denied); *Perry v. Kroger Stores, Store No. 119,* 741 S.W.2d 533, 534 (Tex.App.—Dallas 1987, no writ) (attachment of documents to brief is not formal inclusion in record).

We now look to the Town's zoning ordinance then in effect to see whether procedures were available to the Mayhews to apply for a variance[15] or special-use permit. Article XVII of the Town's zoning ordinance then in effect, in pertinent part, is as follows:

14. The brief was not introduced at trial.

15. As discussed, *supra,* the ordinance also permitted variances in the form of PD applications.

The City Council of the City may, after public hearing and proper notice to all parties affected, and after recommendations from the Planning and Zoning Commission containing such requirements and safeguards as are necessary to protect adjoining property, authorize by ordinance the location of any of the following specified districts:

. . . . .

*Every special use permit granted under the provisions of this article shall be considered as an amendment to the zoning ordinances as applicable to such property.* In granting such permit the City Council may impose conditions which shall be complied with by the grantee before certificate of occupancy may be issued . . .

(Emphasis added.) Article XX of the same ordinance, in relevant part, is as follows:

*The Board is hereby vested with power and authority, in appropriate cases and subject to appropriate conditions and safeguards to make such exceptions to the terms of this ordinance in harmony with its general purpose and intent* and in accordance with general or special rules therein contained for the purpose of rendering full justice and equity to the general public.

. . . . .

*The Board of Adjustment shall have the following powers:*

To hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this ordinance. To hear and decide special exceptions to the terms upon which the Board is required to pass under this ordinance, *to authorize upon appeal in special cases, such variances from the terms of the ordinance as will not be contrary to the public interest. . . .*

(Emphasis added.) A review of the Town's ordinance shows the Town could consider applications for variances and special-use permits. Therefore, the record shows that obtaining a variance is a legally viable option. *See Herrington II,* 857 F.2d at 569–70.

▮ The Mayhews contend that forcing them to apply for a variance would be a "gross usurpation of legislative authority" by the Town.[16] It is true that courts do not require a property owner to resort to piecemeal litigation or otherwise unfair procedures to obtain a determination regarding land use. *See MacDonald,* 477 U.S. at 351 n. 7, 106 S.Ct. at 2567 n. 7. However, even subdivision developers have been required to seek variances to meet ripeness requirements. *See Williamson,* 473 U.S. at 189, 105 S.Ct. at 3117–18.

The record reflects that planned developments are "phased" or built in increments over several years. Joseph Pobiner, the Town's former planner, testified for the Mayhews. He said it is possible to file PD applications in smaller increments of 50 to 100 acres. He said there is no impediment to development in smaller increments. The Mayhews could have applied for alternative development at greater densities than one unit per acre by seeking variances for portions of their property they wished to develop. The best support for a claim of futility is completion of the steps mandated by *Williamson* and *MacDonald:* the unsuccessful pursuit of either a variance or a proposal for less intense development. *See Williamson,* 473 U.S. at 192, 105 S.Ct. at 3119; *MacDonald,* 477 U.S. at 351–52, 106 S.Ct. at 2567–68.

### d. Compliance with Article XV

The Mayhews contend that any reapplication would have been futile because their PD application already complied in every respect with article XV of the Town's zoning ordinance. Article XV concerned planned developments. The record reflects that, in response to requests for admissions, the Town admitted article XV contained all the sub-

---

**16.** Chuck testified that the Town might refuse to issue building permits or delay approval based on issues regarding sewer service. The Mayhews contended at trial that the Town did not have a valid concern regarding the availability of sewer service and that this was a contrived reason for the denial. Chuck also complained that building permits are expensive. However, speculation regarding whether the Town may deny building permits is not evidence of futility.

stantive standards for approval of PD applications.

Article XV set forth the information that an applicant must include in a PD application. For instance, this section of the ordinance encouraged applicants to submit a tentative land-use sketch and to "obtain information on any projected plans, programs, or other matters that may affect the proposed development." The types of information applicants were to provide to the planning and zoning committee in the application included, *inter alia*, information on (1) "the proper relationship between the proposed development and surrounding uses," (2) "adequacy of existing proposed streets ... and other public facilities," and (3) "the adequacy of the land area and of the surrounding areas to accommodate future expansion."

Article XV did *not* set forth specific "approvable" characteristics. In other words, an applicant could meet the requirements of article XV merely by including certain required information in a PD application. Evidence that the Mayhews' PD application "met all of the requirements" of article XV did not entitle the Mayhews to automatic approval of their PD application.

The Mayhews apparently assert that, because they submitted a plan that met all the requirements of article XV, any revised plan would not be any more acceptable to the Town. Article XV did set forth all the requirements for a PD application, and set forth all of the types of information the Town would consider. However, it is clear from reading article XV that fulfilling its requirements does not guarantee automatic approval of a PD application. We hold that, under the facts of this case, the trial court incorrectly concluded in conclusions of law numbers 187, 188, and 190 that further reapplication by the Mayhews was futile and that the Mayhews' claims were ripe.

### 3. Summary and Conclusion

Based on the evidence in this case, we conclude that the Mayhews have not established futility and further conclude that their claims are not ripe. Reviewing the record as a whole, we cannot say that the Mayhews met their burden to prove by sufficient evidence that it was futile to reapply for development. We limit our holding to the facts of this case, and particularly to the facts stated in this opinion regarding futility.

■■ We further point out that the summary judgment evidence not introduced into evidence at trial on remand is not before this Court with regard to its sufficiency review in this appeal. *See Harris County v. Dillard,* 841 S.W.2d 552, 558 (Tex.App.—Houston (1st Dist.) 1992, writ denied); *May v. May,* 829 S.W.2d 373, 376 (Tex.App.—Corpus Christi 1992, writ denied) (op. on reh'g); *Johnson by Johnson v. Li,* 762 S.W.2d 307, 308 (Tex. App.—Fort Worth 1988, writ denied). The "facts" stated by this Court in its prior opinion were, of course, under the summary judgment standard of review, taken as true and viewed in the light most favorable to the Mayhews. The parties did not introduce at trial much of the evidence that apparently was before the trial court during the summary judgment hearing. We did not rely on the "facts" as stated in our prior opinion in rendering this opinion, nor did we consider summary judgment evidence from the record that the trial court did not admit into evidence. *See Sawyer v. Donley County Hosp. Dist.,* 513 S.W.2d 106, 110 (Tex.Civ.App.—Amarillo 1974, no writ) (appellate courts will not consider proof outside record regarding trial court's jurisdiction). We sustain the Town's first four points of error. We also sustain the Town's nineteenth point of error as it concerns the findings of fact discussed herein. Consequently, we dismiss the Mayhews' claims.

In its sixteenth point of error, the Town contends the trial court erred in granting the Mayhews' application for an injunction. Because we dismiss the causes of action on which the trial court based the injunction, we sustain this point of error and reverse that part of the trial court's judgment granting an injunction as a remedy.

■■ In its seventeenth point of error, the Town contends that the trial court erred in awarding attorneys' fees to the Mayhews. Because we dismiss the causes of action on which the trial court based its award of attorneys' fees, we sustain this point of error and

reverse that part of the trial court's judgment awarding attorneys' fees. Because of our disposition of this case regarding the Mayhews' claims, we need not address the Town's other points of error.

We order the Mayhews' claims dismissed and the injunction dissolved.

## SUPPLEMENTAL OPINION ON MOTION FOR REHEARING

In our initial opinion of May 10, 1994, we addressed the issue of ripeness. Since that date, the Texas Supreme Court issued *Taub v. City of Deer Park,* 882 S.W.2d 824 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 904, 130 L.Ed.2d 787 (1995). In this supplemental opinion on motion for rehearing, we apply the law from *Taub* and address the Town's points of error regarding the merits of the Mayhews' takings, equal protection, and due process claims.

### A. Takings

In its eighth point of error, the Town contends that the trial court erred in concluding that the Town deprived the Mayhews of their property's economically viable use when it applied the Town's zoning ordinance to the property. The Town asserts that the Fifth Amendment's prohibition against takings without just compensation does not guarantee the Mayhews the most profitable use of their land.[1] In its twelfth point of error, the Town contends the trial court erred in concluding there was a temporary or permanent taking of the Mayhews' property. In its nineteenth point of error, the Town contends there was no evidence or insufficient evidence to support the trial court's findings of fact.

### 1. Applicable Law and Standard of Review

The Fifth Amendment to the United States Constitution provides that the government shall not take private property for public use without just compensation. U.S. CONST. amend. V. The provision applies to the states under the Fourteenth Amendment's Due Process Clause. *Estate of Scott*

*v. Victoria County,* 778 S.W.2d 585, 589 (Tex. App.—Corpus Christi 1989, no writ). Article one, section seventeen of the Texas Constitution provides that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17. Inverse condemnation occurs when the government violates article one, section seventeen by wrongfully taking property without paying just compensation to the owner. To recover under a theory of inverse condemnation, the property owner must establish that the governmental entity intentionally performed certain acts which resulted in a taking of his property for public use. *Woodson Lumber Co. v. City of College Station,* 752 S.W.2d 744, 746 (Tex.App.—Houston [1st Dist.] 1988, no writ).

A "taking" can be either a physical appropriation of the property or an unreasonable interference with the landowner's right to use and enjoy his property. *See State v. Biggar,* 873 S.W.2d 11, 13 (Tex.1994); *DuPuy v. City of Waco,* 396 S.W.2d 103, 108 (Tex.1965); *Allen v. City of Texas City,* 775 S.W.2d 863, 865 (Tex.App.—Houston [1st Dist.] 1989, writ denied). Governmental restrictions on the use of property can be so burdensome that they result in a compensable taking. *San Antonio River Auth. v. Garrett Bros.,* 528 S.W.2d 266, 273 (Tex.Civ. App.—San Antonio 1975, writ ref'd n.r.e.).

However, all landowners hold property subject to the valid exercise of police power. A municipality is not required to compensate a landowner for losses occasioned by the proper and reasonable exercise of police power. *See City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802, 805 (Tex.1984). To constitute a valid exercise of police power rather than a taking, a municipal ordinance must be: (1) adopted to accomplish a legitimate goal substantially related to the public health, safety, and general welfare; and (2) reasonable rather than arbitrary. *See Turtle Rock,* 680 S.W.2d at 805. Land-use regulations do not effect a taking if they substantially advance a legitimate state

---

1. *See* U.S. CONST. amend. V.

interest. *See Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). A concern about a stench or foul smell is a valid and legitimate concern regarding a municipality's exercise of police power. *See generally Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974) (concern about stench is related to the public health, safety, and general welfare).

▇▇▇▇ Courts also consider the following factors to determine whether a taking has occurred: (1) whether the ordinance rendered the property wholly useless, (2) whether the governmental burden disproportionately diminished or destroyed the property's economic value, and (3) whether the government's action against the owner's economic interest was for its own advantage. *See City of Austin v. Teague,* 570 S.W.2d 389, 393 (Tex.1978). The law presumes that an ordinance is reasonable and valid. Whether a particular ordinance is a proper exercise of police power or constitutes a compensable taking is a question of law for the court. The mere fact that an ordinance may prevent the most profitable use of property does not conclusively establish that there has been a taking. *See Jackson Court Condominiums, Inc. v. City of New Orleans,* 874 F.2d 1070, 1080 (5th Cir.1989); *Taub,* 882 S.W.2d at 826; *Estate of Scott,* 778 S.W.2d at 590.

We have previously stated the standard of review for reviewing the trial court's findings of fact and conclusions of law.

### 2. Applicable Facts

Various witnesses testified about the Mayhews' planned development's economic feasibility. Lane Kendig, a city-planning consultant, testified that the density of a development relates to the development's economic feasibility. He said the Town's zoning ordinance did not allow for economically feasible development of apartments and other types of residential development because the densities allowed by the ordinance were too low.

He said it was unreasonable to expect anyone to use the Town's zoning categories.

David Bagwell, a land developer for the Trammell Crow Company (Crow), testified that, in his opinion, it is not economically feasible to develop single-family residences at a density of either one or two units per acre. John Boyd, a real estate broker, testified that he was familiar with the Mayhews' property and PD application. He stated that, in his opinion, 3600 units was the lowest cost-effective density. He said a planned development with 3600 units would be "pushing it" so that the developer would have to be careful about costs. He testified that Crow sought to develop the Mayhews' planned development with "fancy" amenities and "beautiful corridors." He testified that Crow could not profitably develop the property and would not purchase it unless the Town approved the zoning change. He said a standard, generic development usually involved four units per acre. Boyd said he never calculated whether the Mayhews' planned development would be profitable.

Teresa Butler, a market research consultant, testified that the housing market would absorb homes built on one-acre lots more slowly because they are more expensive. She testified that the housing market could absorb only eight single-family homes per year in Sunnyvale if one-acre zoning remained in place. She said that it would not be economically viable for a developer to build homes at a density of less than three dwelling units per acre. She admitted that, at her deposition, she testified that the Mayhews' planned development would have been viable from a market-absorption standpoint with an overall density of two units per acre.

Daniel Guimond, the economic consultant testifying for the Mayhews, said that some level of development on the Mayhews' property at less than 3.2 units per acre could be economically feasible.[2] Other developers besides Crow had negotiated with the Mayhews regarding development of the property. Michael Smiley, a land planner, testified that

2. We note that the trial court granted a motion in limine prohibiting evidence regarding whether the Mayhews' planned development would be

economically viable at a density of between one and three units per acre.

the Mayhews intended to make their planned development to resemble Highland Park, Texas, with high levels of quality and abundant landscaping. He said Highland Park is an upper income area.

Several witnesses testified that investors assume the Town will deny all development applications. They said the Town's denial of the Mayhews' PD application indicates the Town will not approve any development. Charles Mayhew, Sr. testified that it was not profitable for the Mayhews to use their land for agricultural use. Chip Northrup's testimony about the Mayhews' property is set forth in our May 10, 1994 opinion. Chuck Mayhew's testimony, including his testimony about the market for the Mayhews' property, regarding whether the Mayhews attempted to sell the property, and other uses for the property, is set forth in our initial opinion.

The Mayhews asserted, and the trial court found, that adequate sewer facilities were available for the Mayhews' planned development because the Duck Creek sewage treatment plant would provide sewer service. Robert Ewalt, the Town's manager, testified that, at the time the Town denied the Mayhews' PD application, foul odors existed in the Town. Ewalt testified that the odors were thought to be emanating from the Duck Creek plant.

William Dollar, an assistant city manager for the City of Garland, testified that people complained to the City of Garland that odors were emanating from the Duck Creek plant. He said the City of Garland investigated their source. He said he told officials from the Town that the odors were not coming from the plant. In 1987 or 1988, after the Town denied the PD application, the City of Garland determined that the odors were coming from lake sediment. Dollar showed these findings to some officials. He testified that the City of Garland knew the plant was not the source of the odors, but it had no logical explanation for the odors until it discovered the actual source of the odors.

Joseph Pobiner, a former planner for the Town who testified for the Mayhews, stated that he understood the Duck Creek plant had a history of failures and violations. He said he was concerned with this, but he satisfied himself that the plant could handle the added sewage from the Mayhews' planned development. He testified that he satisfied himself that there were no operational problems with the Duck Creek plant. He said the concern about the Duck Creek plant's history of violations and breakdowns was a reasonable concern regarding an addition to the plant. He stated that the concern about the plant was not a reasonable basis to deny the Mayhews' PD application.

In their preliminary recommendations, the Town's Planning and Zoning Commission recommended that the Town deny the Mayhews' PD application. The recommendation said that the commission believed the planned development would severely impact the Town's ability to provide adequate municipal services. It said, "The Duck Creek Treatment Plant already creates an environmental hazard." The recommendation set forth other concerns and said, "The surrounding areas would be impacted without a balancing contribution to the health, welfare, morals and wellbeing of the community...."

The trial court found that: (1) the Town singled out the Mayhews to bear the costs of "public preferences," (2) the Town intended to prevent all development on the Mayhews' property, (3) the Town destroyed the value of the Mayhews' property, (4) the Mayhews' proposed planned development was the property's only economically viable use, and (5) because of the Town's actions pursuant to its ordinance, there is no economically viable use for the Mayhews' property. The trial court concluded that: (1) the Mayhews' property has no economically viable use, (2) the Town imposed a servitude on the property for the public's benefit, (3) the denial of the PD application did not advance a legitimate state interest, (4) the Town took the Mayhews' property for public use, (5) the Town's actions pursuant to its ordinance destroyed the value of the Mayhews' property, and (6) the Town took the Mayhews' property without just compensation.

### 3. Application of the Law to the Facts

■ Even if we assumed that the Mayhews' takings claim was ripe, the Mayhews

have not established a taking. The Mayhews had the burden at trial to establish that the Town took their property. *See City of Pharr v. Pena,* 853 S.W.2d 56, 60 (Tex.App.—Corpus Christi 1993, writ denied). We will consider all the evidence in the record, including the evidence set forth above and in our May 10, 1994 opinion.

■ Chuck Mayhew testified that the Town deprived the Mayhews of their property's economically viable use. This testimony provides some evidence that the Town intended to deny all development, deprive the Mayhews of their property's economically viable use, and destroy the property's value. We overrule the Town's eighth and nineteenth points of error to the extent they attack the legal sufficiency of the evidence to support the trial court's findings that the Town intended to prevent all development, deny all economically viable use of the Mayhews' land, and destroy the property's value without a reasonable basis.

■ We now address the Town's eighth and nineteenth points of error to the extent they attack the factual sufficiency of the evidence to support these findings. The evidence does not show the Mayhews lost all economically viable use of their property. The Town said it was conducting studies regarding development. It amended its zoning ordinance to permit planned development. These facts show that the Town did not intend to deny all development on the Mayhews' property. The Town denied the Mayhews only a single application for one development proposal. The Mayhews did not apply for any other use. Thus, the Mayhews failed to show the ordinance's application rendered their property wholly useless. *See Teague,* 570 S.W.2d at 393.

■ The Mayhews did not show the governmental burden disproportionately diminished or destroyed the property's economic value. *Id.* The Mayhews asserted that the deprivation of *an* economically viable use diminished the expectation-based value of their land. This deprivation does not constitute a taking. *See Pace Resources v. Shrewsbury Township,* 808 F.2d 1023, 1031 (3rd Cir. 1987); *Taub,* 882 S.W.2d at 826. The fact

that the Town denied the Mayhews their PD application for a 1200–acre planned development does not mean the Town denied the Mayhews *all* economically viable use of their property. *See MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 353 n. 9, 106 S.Ct. 2561, 2568 n. 9, 91 L.Ed.2d 285 (1986). As the Supreme Court indicated in *MacDonald,* the rejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews. *Id.*

The Mayhews also did not show that the Town intended to take their property for its own advantage. *See Teague,* 570 S.W.2d at 393. Like the plaintiff in *City of Pharr v. Pena,* the Mayhews have not shown the Town had an improper motive to deny *all* development. *See Pena,* 853 S.W.2d at 61. The Mayhews maintained the Town took their property for public use and imposed a "scenic easement" on the property. They also asserted the Town sought to keep their property as an open space in order to preserve the Town's rural atmosphere. To preserve a scenic easement, the Town would have to deny all use. The Town's action regarding development studies and zoning ordinance amendments demonstrates it did not intend to deny all development on the Mayhews' property. The Mayhews failed to show the Town's action against their economic interest was for the Town's own advantage. *See Taub,* 882 S.W.2d at 827; *Teague,* 570 S.W.2d at 393.

■ The Mayhews complained that the Town encouraged them to apply for zoning approval and that they spent over $500,000 in the application process. However, purchasing and developing real estate carries with it certain financial risks. The Town did not have a duty to underwrite this risk as an extension of its obligations under the takings clause. *See Taub,* 882 S.W.2d at 826. The takings clause does not charge the government with guaranteeing the profitability of the Mayhews' property. *See id.* Under these circumstances and facts, the Town's refusal to rezone the Mayhews' property places no constitutional burden on their property. *See Taub,* 882 S.W.2d at 826.

We note that, in this case, the Town changed its zoning ordinance to permit planned developments. In moratoria, the Town stated it would conduct studies regarding further development. When the Town denied the Mayhews' PD application, it did not deny all development. These facts demonstrate the Town did not take the Mayhews' property. *See Schafer v. City of New Orleans,* 743 F.2d 1086, 1090 (5th Cir.1984).

▮ Based on a review of all the evidence, we hold that the trial court's inferences from the facts and resulting findings that the Town intended to prevent all development, deny all economically viable use of the Mayhews' land, and destroy the property's value are against the great weight and preponderance of the evidence. The Mayhews did not establish that the Town effected a taking under either the Texas or federal constitutions.[3] *See Taub,* 882 S.W.2d at 826; *Teague,* 570 S.W.2d at 394–95. We sustain the Town's eighth and nineteenth points of error to the extent the Town complained of the factual sufficiency of the evidence to support the trial court's findings of fact 99, 100, 103, 104, 105, 120, and 121. We also sustain the Town's eighth and twelfth points of error to the extent the Town complained of the trial court's conclusions 165, 166, 167, 169, 170, 171, and 172.

### B. Substantive Due Process

In its ninth point of error, the Town contends the trial court erred in concluding that the Town's zoning regulations or its actions pursuant to its zoning ordinance deprived the Mayhews of substantive due process or did not substantially advance legitimate governmental interests. In its nineteenth point of error, the Town contends there is no evidence or insufficient evidence to support the trial court's findings.

### 1. Applicable Law and Standard of Review

▮ Substantive due process requires a municipality's zoning ordinance to be rationally related to a legitimate state purpose.

*See Aladdin's Castle, Inc. v. City of Mesquite,* 630 F.2d 1029, 1039 (5th Cir.1980), *rev'd in part on other grounds,* 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). A municipality may not arbitrarily infringe upon protected property rights and arbitrarily limit land use. *See Spring Branch I.S.D. v. Stamos,* 695 S.W.2d 556, 561 (Tex.1985) (citing *Spann v. City of Dallas,* 111 Tex. 350, 235 S.W. 513 (1921)), *appeal dism'd,* 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986). Instead, municipalities must base their actions on reason. They must not arbitrarily exercise police power. Ordinances must bear a substantial relation to public health, safety, and welfare. *See Nectow v. City of Cambridge,* 277 U.S. 183, 187–88, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928); *Turtle Rock,* 680 S.W.2d at 805.

▮ The concept of "public welfare" has a broad range. *Turtle Rock,* 680 S.W.2d at 805. It represents values that are spiritual as well as physical, and aesthetic as well as monetary. A municipality's legitimate concern is to ensure that the community is beautiful as well as healthy, spacious as well as clean, and well balanced as well as carefully patrolled. *See Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). The courts presume municipal exercises of police power are valid with regard to their substantive integrity. *See, e.g., Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395–96, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). The courts may not interfere unless the ordinance is unreasonable, arbitrary, and a clear abuse of municipal discretion. *See Hunt v. City of San Antonio,* 462 S.W.2d 536, 539 (Tex.1971).

### 2. Applicable Facts

The Mayhews base their substantive due process claim on their allegations that: (1) the Town did not base its denial of the PD application on any criteria set forth in the zoning ordinance and, for that reason, the denial was arbitrary and capricious, and (2) the application of one-acre zoning deprived

3. We are aware that we are not limited in our analysis of constitutional rights under the Texas Constitution to caselaw interpreting similar rights under the United States Constitution. *See Davenport v. Garcia,* 834 S.W.2d 4, 8 (Tex.1992).

the Mayhews of substantive due process because the zoning ordinance does not accomplish a legitimate public purpose. The trial court entered findings of fact and conclusions of law. The trial court found that: (1) the Mayhews' planned development would not have an adverse effect on the public health, safety and welfare, (2) there was no legitimate sewer problem, (3) one-acre zoning did not bear a relationship to the public health, safety and welfare, and (4) the Town's zoning ordinance was not rational or related to the public health, safety and welfare. The trial court concluded that: (1) sewer service was accessible, (2) there was no factual basis to deny the PD application and the denial was arbitrary and unrelated to the public health, safety and welfare, (3) one-acre zoning was not related to the public health, safety and welfare or any other public purpose and no rational person could have found it was so related, and (4) the Town violated the Mayhews' substantive due process rights when it denied the Mayhews' PD application and applied one-acre zoning.

### 3. Application of the Law to the Facts

 To review the trial court's findings regarding the Mayhews' substantive due process claims, we must review the evidence about whether the Town's ordinance and its application of the ordinance were rationally related to a legitimate state purpose. See *Aladdin's Castle*, 630 F.2d at 1039. We must address whether the evidence shows the Town acted arbitrarily rather than with a legitimate state purpose when it denied the Mayhews' PD application. We will first address the Town's no evidence point of error regarding (1) whether the Town had a rational basis for denying the Mayhews' PD application, and (2) whether the Town could have rationally believed there was a problem with sewer service and the Duck Creek plant.

 The record reflects that Joseph Pobiner said it was not reasonable for the Town to deny the Mayhews' PD application based on concerns about adequate sewer service. This testimony provides some evidence supporting the trial court's findings that the Town's denial of the PD application was not rationally related to a legitimate state pur-

pose. We overrule the Town's nineteenth point of error to the extent that the Town contends that no evidence supports the trial court's findings 37, 53, 76, 77, 93, 94, and 98. We now address the Town's nineteenth point of error to the extent it challenges the factual sufficiency of the evidence to support the trial court's findings.

 The record shows that the Town's zoning ordinance and denial of the Mayhews' PD application were substantially related to the public health, safety, and general welfare. The evidence set forth under point of error eight shows that the Duck Creek plant had experienced problems with violations and breakdowns. Recently, the plant had been operating under the Environmental Protection Agency's supervision. The Town's citizens were concerned about a stench that people thought the Duck Creek plant produced. The Town had a legitimate state interest in controlling the stench that reasonably could be perceived to be caused by the Duck Creek plant. Reasonable minds could have differed regarding whether the denial of a large development project that would further tax the plant is a rational and reasonable means of accomplishing that purpose. Based on this evidence, we determine that this concern substantially relates to the public health, safety, and general welfare. See *Village of Belle Terre*, 416 U.S. at 9, 94 S.Ct. at 1541.

 The trial court inferred from the facts and found that the Town could not have rationally believed there was a problem with sewer service and the Duck Creek plant. It also found that the Town's denial of the PD application and application of one-acre zoning bore no substantial relation to the public health, safety, and welfare. Based on all of the evidence in the record, specifically that set forth above and in our initial opinion, we hold that the trial court's inferences from the facts and resulting findings in this regard are against the great weight and preponderance of the evidence. A review of all the evidence shows that reasonable minds could differ regarding (1) whether the Town's reason for denying the Mayhews' PD application was rationally related to the public health, safety, and welfare and (2) whether the Town

abused its discretion in denying the PD application and continuing to apply one-acre zoning to the property. *See Turtle Rock,* 680 S.W.2d at 805. Reasonable minds could differ about whether the Town could have reasonably believed it should delay development to further study municipal planning and the availability of municipal services. *See Shelton v. City of College Station,* 780 F.2d 475, 479 (5th Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566, *and cert. denied,* 479 U.S. 822, 107 S.Ct. 89, 93 L.Ed.2d 41 (1986); *Turtle Rock,* 680 S.W.2d at 805; *State v. Richards,* 157 Tex. 166, 301 S.W.2d 597, 602 (1957). Because of prior difficulties with the Duck Creek plant, reasonable minds could differ about whether this delay was related to the public health, safety and welfare. *See Shelton,* 780 F.2d at 479; *Turtle Rock,* 680 S.W.2d at 805. We sustain the Town's nineteenth point of error to the extent the Town complains about the factual sufficiency of the evidence to support findings 37, 53, 76, 77, 93, 94, and 98.

■■■■ Further, we have already held that the Town did not deprive the Mayhews of a constitutionally-protected property interest. Therefore, because the Mayhews have not shown an arbitrary infringement of a property right, they have not established a substantive due process violation under either the Texas or federal constitutions. *See Stamos,* 695 S.W.2d at 561. The trial court's conclusions that the application of the Town's zoning ordinance and the denial of the Mayhews' PD application denied the Mayhews' substantive due process are incorrect. We sustain the Town's ninth point of error.

## C. Equal Protection

In its fifth point of error, the Town contends the trial court erred in concluding that the Town's denial of the Mayhews' PD application violated their equal protection rights. In its tenth point of error, the Town asserts that the trial court erred in concluding that the Town's zoning regulations and its actions pursuant thereto violated the Mayhews' equal protection rights because: (1) the Mayhews are not members of a suspect class, (2)

the denial was rationally related to the legitimate state interest of assuring adequate public facilities, and (3) no evidence shows that the Town treated the Mayhews differently from other similarly-situated property owners.

### 1. Applicable Law and Standard of Review

■■■■ To assert an as-applied equal protection claim, a plaintiff must allege the defendant treated the plaintiff differently from other similarly-situated landowners without any reasonable basis. *Executive 100, Inc. v. Martin County,* 922 F.2d 1536, 1541 (11th Cir.), *cert. denied,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991). In response to an equal protection challenge, courts presume an ordinance is valid and will sustain it if the statutory classification rationally relates to a legitimate state interest. *See HL Farm Corp. v. Self,* 877 S.W.2d 288, 290 (Tex.1994). Under the federal standard, if any state of facts justifies the ordinance, the court should uphold the ordinance. *See Sullivan v. Stroop,* 496 U.S. 478, 485, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990). If an ordinance infringes upon fundamental rights or burdens an inherently suspect class, courts will subject it to "strict" or heightened scrutiny. *See Stamos,* 695 S.W.2d at 560. If an ordinance is not subject to heightened scrutiny, courts should review the zoning ordinance's application to decide whether it rationally relates to its intended purpose. *See Sullivan v. University Interscholastic League,* 616 S.W.2d 170, 172 (Tex.1981).

### 2. Applicable Facts

In their pleadings, the Mayhews alleged that the Town arbitrarily and capriciously denied their PD application and did not base the denial on factors related to the public health, safety, and welfare.[4] The trial court made the following conclusions of law:

162. The application of the Town of Sunnyvale's one-acre zoning to Plaintiff's property does not serve and does not have a rational relationship to a legitimate public

---

4. The Mayhews did not go forward with allegations that the Town had a racially motivated intent when it applied one-acre zoning to the Mayhews' property.

purpose and denies Plaintiffs equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States and article I, section 8 of the Constitution of the State of Texas.

163. No rational person could conclude, and reasonable persons could not differ, that the classifications in the Zoning Ordinance of the Town of Sunnyvale are rationally related to a legitimate public purpose.

### 3. Application of the Law to the Facts

On appeal, the Town contends it did not deny equal protection to the Mayhews because no evidence shows the Town treated similarly-situated landowners differently. The Town contends the denial of the Mayhews' PD application was rationally related to a legitimate purpose and did not violate the Mayhews' fundamental rights. The Mayhews asserted in their brief that the evidence supports the trial court's findings because (1) the Town allowed other landowners to build on lots of less than one acre while the Mayhews could not, and (2) the one-acre requirement and other ordinance classifications did not make sense.

 We must review the challenged conclusions of law for correctness. See Mercer, 715 S.W.2d at 697. Initially, we must determine whether strict scrutiny applies. See Stamos, 695 S.W.2d at 560. The Mayhews do not have a fundamental right to have their property rezoned to permit a 1200–acre planned development. See generally Taub, 882 S.W.2d at 826–27. The Mayhews are not members of a suspect class. See Stamos, 695 S.W.2d at 559. Therefore, strict scrutiny does not apply, and we must determine whether the application of one-acre zoning and the denial of the PD application was rationally related to a legitimate state interest. See Stamos, 695 S.W.2d at 560.

 We have already held that the Town's denial of the Mayhews' PD application and application of the zoning ordinance to the Mayhews' property served a legitimate state interest. Therefore, the Mayhews' equal protection claim must fail on that ground. Further, nothing in the record

shows the Town treated the Mayhews differently from other similarly-situated landowners. The record reflects that the Town granted variances to some landowners who developed on lots of less than one acre. However, a landowner seeking a zoning change for a 1200–acre development is not "similarly situated" to a landowner seeking to build on a small parcel of land. No evidence shows that the Town denied the Mayhews a planned development while granting other landowners' PD applications. The Mayhews have not shown that the Town treated them differently from those similarly situated. See Executive 100, 922 F.2d at 1541.

For these reasons, we conclude that the Mayhews failed to prove the Town denied them equal protection under either the Texas or federal constitutions. We hold that the trial court's conclusions of law 162 and 163 concluding that the Town denied the Mayhews equal protection of the laws are incorrect. See Mercer, 715 S.W.2d at 697. Accordingly, we sustain the Town's fifth and tenth points of error.

### D. Procedural Due Process Claims

In its fourth point of error and the argument under this point of error, the Town contends that the Mayhews' due process claims were not ripe for review. In its eleventh point of error, the Town contends that the trial court erred in concluding that the Town deprived the Mayhews of procedural due process.

In their pleadings, the Mayhews did not allege that the Town deprived them of notice and a hearing regarding their PD application. They alleged that the vagueness of the ordinance deprived them of procedural due process and that the Town unfairly applied standards for approval of their PD application. The trial court concluded that the Town exercised unfettered discretion in denying the PD application, applied ad hoc unwritten standards, and engaged in an unfair, procedurally unconstitutional process in reviewing the PD application. The trial court concluded this violated the Mayhews' procedural due process rights. The court found the Town did not follow normal proce-

dural practices in considering the PD application. The trial court also found the Town held numerous public workshops and hearings regarding the Mayhews' PD application.

The Town's zoning ordinance provided that landowners filing PD applications were to provide the Town with information regarding traffic, population, sewer service availability, and other issues. From this information, the Town could then decide whether to grant a PD application as a variance. The Mayhews apparently contend the ordinance's application was unfair because they could not look at factors the ordinance listed and know precisely whether the Town would approve their PD application.

Under their procedural due process allegations, the Mayhews did not complain of the lack of notice and a hearing, but instead asked the trial court to grant them the right to develop their property. The Mayhews' procedural due process claim is coextensive with their asserted takings claim. Therefore, because this claim is based on the same state action that is the basis for their takings claim, it is subject to the same ripeness analysis. *See Rocky Mountain Materials v. Board of County Comm'rs*, 972 F.2d 309, 311 (10th Cir.1992). The Mayhews' procedural due process claim is not ripe for review for the same reasons that their takings claim is not ripe. *See id; Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 893–94 (6th Cir.1991); *see also Herrington v. County of Sonoma*, 857 F.2d 567, 569 n. 1 (9th Cir.1988), *cert. denied*, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989).

■■■■■ The central theme of procedural due process is that, if a governmental action affects a party's liberty or property rights, the party is entitled to notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Anderson v. Douglas County*, 4 F.3d 574, 578 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In a zoning context,

assuming a landowner has a protectable property interest, a municipality affords procedural due process when the municipality provides the landowner with notice of the proposed government action and an opportunity to be heard. *Anderson*, 4 F.3d at 578; *Jackson Court*, 874 F.2d at 1075.

■■■■■ We have already held that the evidence does not show that the Town deprived the Mayhews of their property. Therefore, because the Town has not deprived them of a protectable property interest, procedural due process is not necessary. *See Schafer*, 743 F.2d at 1089. Further, the trial court found that the Town held numerous hearings regarding the PD application.[5] This satisfies procedural due process requirements. *Id.*

■■■ Under their procedural due process claim, the Mayhews also appear to assert substantive due process deprivations. *See Schafer*, 743 F.2d at 1089. Regarding their claim that the ordinance's vagueness permitted the Town to act arbitrarily and with unfettered discretion, we first note that the trial court did not declare the ordinance facially void for vagueness.[6] The Town's ordinance is not vague; it proscribes building on lots of less than one acre in designated districts. The ordinance is not so indefinite that people of common intelligence must guess at its meaning and differ as to its application. *See Jackson Court Condominiums v. City of New Orleans*, 665 F.Supp. 1235, 1242 (E.D.La.1987), *aff'd*, 874 F.2d 1070 (5th Cir. 1989). The fact that the Town must exercise discretion in granting variances for planned developments and that a landowner does not know precisely when the Town will grant a variance does not render the ordinance unconstitutionally vague. *See Jackson*, 665 F.Supp. at 1242.

The Mayhews' procedural due process claim is not ripe. Even assuming ripeness, the Mayhews failed to show that the Town deprived them of procedural due process un-

---

5. The trial court found that the Town's procedural practices were not fair and that they varied from the norm. To the extent the Mayhews stated other due process related claims in which they alleged unfairness, we will address these claims.

6. The trial court concluded that the Town applied ad hoc unwritten standards when it denied the PD application, thus violating the Mayhews' right to procedural due process.

der either the federal or state constitutions. *See Jackson Court,* 874 F.2d at 1075; *Ivy v. Edna Gladney Home,* 783 S.W.2d 829, 833–34 (Tex.App.—Fort Worth 1990, no writ); *Merritt v. Harris County,* 775 S.W.2d 17, 21 (Tex.App.—Houston [14th Dist.] 1989, writ denied). Accordingly, the trial court's conclusions 153 and 154 are incorrect. *See Mercer,* 715 S.W.2d at 697. We sustain the Town's fourth and eleventh points of error.

### E. Conclusion

We addressed the Mayhews' § 1983 claims and claims for attorneys' fees and an injunction in our May 10, 1994 opinion. Again, because of our disposition of the Mayhews' claims, we need not address the Town's remaining points of error.